

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § § | SEALED |
| v. | § § | Case No. 4:22 CR153 |
| | § | Judge Jordan |
| JASON BRADLEY CROSS (1) STEVEN NECOLI BOOK, JR. a/k/a NICK BOOK (2) EUGENE ELFRANK (3) | § § § § | |

## INDICTMENT

THE UNITED STATES GRAND JURY CHARGES:

### General Allegations

At all times material to the facts set forth in this Indictment:

1. Jason Bradley Cross ("**Cross**") and Steven Necoli Book, Jr. a/k/a Nick Book ("**Book**") were individuals residing in the Eastern District of Texas. Eugene Elfrank ("**Elfrank**") was an individual residing in the state of Washington.

2. Isotex Health, LLC ("Isotex") was a business located in the City of McKinney, in the Eastern District of Texas. During the events described in this Indictment, **Cross**, **Book**, and **Elfrank** (collectively, "defendants") were the Managing Members of Isotex.

3. On or about June 12, 2018, the defendants opened a business bank account in the name of Isotex at Legacy Bank of Texas, with account number ending in 1028 ("Isotex Bank Account"). The defendants—**Cross**, **Book**, and **Elfrank**—were the sole signers on the Isotex Bank Account.

### *Hemp and CBD*

4. Hemp is a variety of the cannabis plant, which is cultivated for its heavy-duty fibers, low levels of tetrahydrocannabinol (THC), and higher levels of cannabidiol (CBD). CBD is one of many natural compounds found in hemp and cannabis sativa plants. "CBD extract" refers to the process and form that comes from removing the sought-after CBD from the flowering part of the plant. "Hemp biomass" refers to the organic materials of the hemp plant that are left over after the flowers have been harvested. Although not found to the levels present in the hemp flower, CBD can be extracted from hemp leaves, which can be integrated into various consumer products, including CBD oils, lotions, and edible items.

### **COUNT 1**

Violation: 18 U.S.C. § 1349 (Conspiracy to Commit Wire Fraud)

5. The General Allegations section of this Indictment is realleged and incorporated by reference as though fully set forth herein.

6. From in or around 2018, and continuing up through April 9, 2019, in the Eastern District of Texas and elsewhere, the defendants, **Jason Cross**, **Nick Book**, and **Eugene Elfrank**, conspired to commit wire fraud, a violation of Title 18 United States Code Section 1343, and knowingly and willfully joined in the agreement with the intent to further its unlawful purpose.

### **Overview of the Conspiracy**

7. Between 2018 and April 9, 2019, **Jason Cross**, **Nick Book**, and **Eugene Elfrank** solicited investments for their business, Isotex, from individuals living in North

Indictment
Page 2

Texas and around the United States. Through pitch meetings, emails, and marketing materials, the defendants represented that Isotex was a lucrative hemp and CBD business, with sales contracts, purchase orders, and letters of intent (LOI) with various industry partners totaling several billion dollars. In addition, the defendants told their investors that they would receive up to 120% return on investment and that the investment funds would be used to purchase industrial hemp biomass, which in turn would be planted, harvested, and sold per Isotex's business model. In reality, the defendants transferred the investor funds to other business and personal accounts, paid themselves salaries, and spent only a small portion of the funds as indicated. All told, the defendants fraudulently took at least $760,000 from at least five investors.

## Purpose of the Conspiracy

8. It was the general purpose of the conspiracy for the defendants to unlawfully and unjustly enrich themselves by obtaining money from victim investors by means of materially false and fraudulent pretenses, representations, and promises.

## Manner and Means of the Conspiracy

9. The manner and means by which the defendants sought to accomplish the conspiracy included, among others, the following:

   a. The defendants used the business Isotex Health, LLC to solicit funds from prospective investors.

   b. The defendants opened and used various bank accounts, including the Isotex Bank Account ending in 1028, to receive and transfer investor funds.

c. The defendants falsely represented to investors that Isotex had lined up purchase orders, sales contracts, and letters of intent totaling several billion dollars.

d. The defendants pitched investors through in-person meetings, phone calls, and emails.

e. The defendants provided marketing materials to investors detailing their business and revenue plan.

f. The defendants told investors that the investor funds would be used for purchasing hemp seeds, hemp biomass, and other related business expenditures.

g. The defendants executed contracts with investors, which described: specific figures on rates of return and payouts; collateral to be used in the event of inability to repay the investment; and promised use of investor funds.

h. The defendants spent the majority of investor money on personal and business expenses unrelated to the purchase of hemp seeds and hemp biomass for Isotex.

i. The defendants caused wire transfers and financial transactions that affected interstate and foreign commerce.

## Acts in Furtherance of the Conspiracy

In furtherance of the conspiracy, the defendants committed the following acts, among others, in the Eastern District of Texas and elsewhere.

### *Victim Investor G.G.*

10. In or around August 2018, **Cross** approached an individual with initials G.G. regarding an investment opportunity in Isotex. According to **Cross**, Isotex would use G.G.'s investment to purchase hemp seeds, which in turn would be planted and harvested on property Isotex owned in Walla Walla, Washington. **Cross** also confirmed that if G.G.

invested $270,000 with Isotex, G.G. would be paid $594,000 after the harvest and sale of the hemp plants, which would occur no later than November 8, 2018.

11. Following **Cross'** pitch, G.G prepared a detailed contract to protect G.G.'s investment with Isotex. According to the contract, G.G.'s $270,000 investment was to be used solely to purchase hemp seed, which was to be planted, harvested and sold. The contract did not specify any other use of the investment funds. Within the contract, **Book** and **Cross** also listed their real estate properties to be pledged as collateral in the event that G.G. did not receive his investment return of $594,000.

12. On or about September 4, 2018, **Cross**, **Book**, **Elfrank**, and **Cross'** wife signed the contract via DocuSign. On or about September 5, 2018, G.G. executed a $270,000 wire transfer from his bank account to the Isotex Bank Account. Prior to the deposit of G.G.'s funds, the balance in the Isotex Bank Account was approximately $453.

13. The defendants' representations about Isotex were false. Isotex did not own property in Walla Walla, Washington designated for growing hemp. Nor were any of G.G.'s investment funds actually used to purchase hemp seeds. Instead, **Cross**, **Book**, and **Elfrank** transferred a large portion of the funds to their other personal and business bank accounts. In fact, within approximately 45 days of receiving G.G.'s investment, the defendants spent the entirety of the $270,000. And without the knowledge or consent of G.G., **Cross** and **Book** sold the real properties listed as collateral in the investment contract. G.G. lost his entire $270,000 investment and never recovered any money from Isotex.

### *Victim Investor J.M.*

14. On November 8, 2018, **Cross** and **Elfrank** met with a prospective investor, an individual with initials J.M., at the Stonebriar Mall, in Frisco, Texas, in the Eastern District of Texas. During the meeting, **Cross** and **Elfrank** presented an Isotex business plan entitled "CBD Isolate from Industrial Hemp Investment/Partnering Opportunity – October 2018." The document contained the following representations, among others:

   a. "Isotex Health, LLC, is building the largest North American seed-to-sale manufacturing facility for the production of CBD oils and isolates from industrial hemp."

   b. "Isotex Health, LLC, is poised to become a major leader in the production of CBD isolate. Isotex Health, LLC, has purchase orders for large quantities that it needs to begin to fulfill for our clients. It will take 5-6 months to complete our processing facility, but in the meantime we have Biomass Agreements to purchase the materials needed for our Tolling Agreements, so multiple facilities can produce small amounts of CBS Isolate at multiple locations and combine them to fulfill our larger contracts. This will keep the clients satisfied and create cash flow while we build out our processing lines. Net cash flow from the first 6 months of toll processing will be at least $20,000,000."

   c. As of October 2018, the pending sales contracts and letters of intent (LOI) to purchase CBD isolate from Isotex totaled $5,292,606,400.

15. During that same meeting, **Cross** and **Elfrank** made several statements to J.M. which were captured on audio recording. For instance:

   a. **Cross** stated: "If you're looking at the true amount of kilos, we'd be doing 675,840 per year at full capacity, and $2,890,000,000 dollars, and that's the wholesale revenue, but then you talk about the gross margin would be $1,880,000,000 and it just sounds crazy, so, and that how we're able to pay, you know, 10% every month, from the fourth month to the fifteenth month, including principal."

   b. **Cross** also said: "Toll processing should make us $66,500,000 off of that one contract in 90 days. So if we can buy $3,000,000 worth of biomass,

essentially $1,000,000 worth of biomass to start off with, 5,000 pounds at $40.00 a piece, put 30% down on the facility, put the money down on the equipment, and start making some money off of those first tolls, we'll be at this in 90 days, and that's why we're able to pay out so much to everybody."

c. **Elfrank** stated that he had an exclusive agreement with "Nvigorate," a CBD water company owned by former professional basketball player Chris Webber. He also boasted he had conversations with the Coca-Cola Company regarding CBD. **Elfrank** added: "In the past thirty days I've probably had at least eight conversations with Mike Tyson, right, they're building a ranch in California called Mike Tyson Ranch. It's going to be a therapeutic retreat, and everything they make is all CBD based. The massage oil, the sex lube, is all CBD based. They'll be one of our customers."

d. **Elfrank** also claimed: "But it's real, I wouldn't be doing it if it wasn't real. I mean I can tell you hard facts, I've made more money in 11 months in hemp than I made in 5 years in weed."

16. Based on **Cross** and **Elfrank's** representations, J.M. decided to invest approximately $300,000 with Isotex. The defendants indicated that J.M.'s investment would only used to purchase industrial hemp biomass. Between November 12, 2018, and November 14, 2018, J.M. finalized a written agreement with Isotex, which was signed by **Cross** and notarized by **Cross'** wife. Per the terms of the agreement, J.M. was to be compensated 2% of the net investment ($6,000) to be paid out quarterly, as well as $30,000 per month for consulting for 12 months, beginning the fourth month.

17. On November 15, 2018, J.M. initiated a $300,000 interstate wire transfer to **Cross'** personal bank account, and on November 16, 2018, **Cross** transferred J.M.'s $300,000 investment to the Isotex Bank Account. Prior to J.M.'s investment, the balance in the Isotex Bank Account was approximately $4,900.

18.  In contrast to the defendants' representations, at the time of J.M.'s investment, Isotex did not have revenue-generating business operations, nor did Isotex have sales contracts and letters of intent totaling over $5 billion. In fact, both **Cross** and **Elfrank** filed for bankruptcy within approximately one year preceding their November 2018 meeting with J.M. This was never disclosed to J.M. prior to J.M.'s investment. Nor was the money spent as indicated, with only a small portion going towards the purchase of hemp biomass. By the end of December 2018, within approximately 45 days of J.M.'s investment, the entire $300,000 investment was depleted. J.M. lost approximately $267,000 as a result of his investment with Isotex.

### *Use of Investor Money*

19.  The defendants spent Isotex's investor funds in a manner inconsistent with the representations made to the investors. The defendants actually paid themselves salaries, made loans to their own businesses, and spent the money on business expenses unrelated to hemp seeds or biomass. The following transactions illustrate the type of expenditures made by the defendants following the receipt of investor funds:

   a. On September 11, 2018, within a week of receiving investor money from G.G., **Cross** transferred $58,686.32 from the Isotex Bank Account to **Cross'** personal account at Legacy Texas Bank.

   b. On September 12, 2018, within a week of receiving investor money from G.G., **Book** transferred $55,000 from the Isotex Bank Account to a Legacy Texas Bank account ending in 1226, in the name of BQB Capital, LLC, which **Book** owned and controlled.

   c. On November 16, 2018, a day after receiving the investor money from J.M., **Elfrank** wired $20,000 from the Isotex Bank Account to a Bank of America

account ending in 5527, in the name of Health Source Supply, LLC, which **Elfrank** owned and controlled.

20.     Over the course of scheme, the defendants solicited other investments in Isotex using similar representations about the success of the business, the use of investment funds to purchase of hemp biomass, and the promised high rates of return. During the conspiracy, the defendants fraudulently obtained at least $760,000 from at least five investors.

All in violation of 18 U.S.C. § 1349.

# COUNT 2

Violation: 18 U.S.C. § 1956(h)<br>(Conspiracy to Commit Money Laundering)

21. Paragraphs 1 – 20 of this Indictment are realleged and incorporated by reference as though fully set forth herein.

22. On or about the dates set forth below, in the Eastern District of Texas and elsewhere, the defendants, **Jason Cross, Nick Book,** and **Eugene Elfrank**, did knowingly conspire with each other and with other persons known and unknown to the Grand Jury to violate Title 18, United States Code, Section 1956 and Section 1957, to wit: to knowingly engage and attempt to engage, in monetary transactions by, through or to a financial institution, affecting interstate and foreign commerce, in criminally derived property of a value greater than $10,000, such property having been derived from a specified unlawful activity, that is, wire fraud, a violation of Title 18 United States Code Section 1343.

All in violation of 18 U.S.C. § 1956(h).

## NOTICE OF INTENT TO SEEK CRIMINAL FORFEITURE

Pursuant to 18 U.S.C. §§ 981(a)(1)(C) and 982(a)(1) and 28 U.S.C. § 2461

1. The allegations contained in Counts 1 and 2 of this Indictment are realleged and incorporated by reference as though fully set forth herein for the purpose of alleging forfeiture to the United States of America of certain property in which the defendant has an interest.

2. Upon conviction of any violation of 18 U.S.C. § 1349, the defendants, **Jason Cross, Nick Book,** and **Eugene Elfrank**, shall forfeit to the United States any property, real or personal, that constitutes or is derived from proceeds traceable to the offense(s), pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c). The property, which is subject to forfeiture, includes but is not limited to, a money judgment, and all interest and proceeds traceable thereto, representing the proceeds of the offenses, for which the defendants are jointly and severally personally liable.

3. Upon conviction of any violation of 18 U.S.C. § 1956, the defendants, **Jason Cross, Nick Book,** and **Eugene Elfrank** shall forfeit to the United States any property, real or personal, involved in such offense, or any property traceable to such property, pursuant to 18 U.S.C. § 982(a)(1), including a money judgment representing funds involved in the offense.

4. Pursuant to 21 U.S.C. § 853(p), as incorporated by reference by 18 U.S.C. § 982(b), if any of the forfeitable property, or any portion thereof, as a result of any act or omission of the defendants:

    a. Cannot be located upon the exercise of due diligence;

    b. Has been transferred, or sold to, or deposited with a third party;

    c. Has been placed beyond the jurisdiction of the Court;

    d. Has been substantially diminished in value; or

    e. Has been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States to seek the forfeiture of other property of the defendants up to the value of the above-described forfeitable properties, including, but not limited to, any identifiable property in the names of the defendants, pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c).

5.    By virtue of the commission of the offenses alleged in this Indictment, any and all interest that the defendants have in the above-described property is vested in the United States and hereby forfeited to the United States pursuant to 18 U.S.C. § 981(a)(1)(C), 18 U.S.C. § 982(a)(1), and 28 U.S.C. § 2461(c).

All pursuant to 18 U.S.C. § 981(a)(1)(C), 18 U.S.C. § 982(a)(1), and 28 U.S.C. § 2461(c) and the procedures set forth at 21 U.S.C. § 853, as made applicable through 18 U.S.C. § 982(b)(1).

A TRUE BILL

_____
GRAND JURY FOREPERSON

BRIT FEATHERSTON
UNITED STATES ATTORNEY

_____   6-15-2022
ANAND VARADARAJAN           Date
Assistant United States Attorney

Indictment
Page 13

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § § | SEALED |
| v. | § § | Case No. 4:22 Judge |
| JASON BRADLEY CROSS (1) STEVEN NECOLI BOOK, JR. a/k/a NICK BOOK (2) EUGENE ELFRANK (3) | § § § § | |

## NOTICE OF PENALTY

### COUNT 1

Violation:        18 U.S.C. §§ 1349 (Conspiracy to Commit Wire Fraud)

Penalty:         Imprisonment for a term not more than 20 years, a fine not to exceed $250,000.00, or if any person derives pecuniary gain from the offense, or if the offense results in pecuniary loss to a person other than the defendant—then a fine not more than the greater of twice the gross gain to the defendant or twice the gross loss to individual(s) other than the defendant; or both such imprisonment and fine. A term of supervised release of not more than three years in addition to such term of imprisonment.

If the violation affected a financial institution, then:
Imprisonment for a term not more than 30 years, a fine not to exceed $1,000,000.00, or if any person derives pecuniary gain from the offense, or if the offense results in pecuniary loss to a person other than the defendant—then a fine not more than the greater of twice the gross gain to the defendant or twice the gross loss to individual(s) other than the defendant; or both such imprisonment and fine. A term of supervised release of not more than five years in addition to such term of imprisonment.

Special
Assessment:        $100.00

## COUNT 2

| | |
|---|---|
| <u>Violation</u>: | 18 U.S.C. § 1956(h) (Conspiracy to Commit Money Laundering) |
| <u>Penalty</u>: | Imprisonment for a term not more than ten years, a fine not to exceed $250,000, or if any person derives pecuniary gain from the offense, or if the offense results in pecuniary loss to a person other than the defendant—then a fine not more than the greater of twice the gross gain to the defendant or twice the gross loss to individual(s) other than the defendant; or both such imprisonment and fine. A term of supervised release of not more than three years in addition to such term of imprisonment. |
| <u>Special Assessment</u>: | $100.00 each count |